COURT OF APPEALS DIV 1
2015 APR -6 AM 9: 50


IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 70799-0-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CHARLES V. LEE, | ) | |
| | ) | |
| Appellant. | ) | FILED: April 6, 2015 |

SCHINDLER, J. — The State charged Charles V. Lee with two counts of rape of a child in the first degree and two counts of child molestation in the first degree. A jury convicted Lee of the one count of rape of a child in the first degree that the mother witnessed. Lee seeks reversal, arguing the court erred in admitting child hearsay and excluding evidence. Lee also argues the jury instruction defining "reasonable doubt" misstated the law, the prosecutor committed misconduct in closing argument, the evidence does not establish an element of the crime, and cumulative error requires reversal. In the alternative, Lee challenges the community custody conditions restricting his Internet usage and requiring him to submit to plethysmograph testing. We remand to strike the community custody condition restricting Internet use. In all other respects, we affirm.

FACTS

M.N. was born in December 2000. In 2007, M.N. and her mother, R.N., lived in an apartment in Mill Creek. R.N. has two older children, A.N. and C.W. A.N. lived with his grandmother and C.W. had been in foster care since 1998.

R.N. met Charles V. Lee in 2007 or early 2008. R.N. became pregnant, and A.L. was born in November 2008. R.N. continued to have a relationship with Lee after A.L. was born and gave Lee a key to her apartment. Lee often went to the apartment to spend time with A.L. M.N. and Lee did not always get along. M.N. would get mad when her mother agreed with Lee. R.N. told Lee that M.N. had previously "made up an allegation of sexual assault" against another man.

On November 11, 2010, R.N. questioned nine-year-old M.N. about "things [that] had gone missing" around the house. In response, M.N. told her mother that the day before, Lee "sexually assaulted her." R.N. testified M.N. told her Lee "fondled her breasts, that he's played with her breasts and that he had intercourse with her, that went inside her vagina." M.N. also told R.N. that Lee "did something in her mouth and she spit it out."

R.N.'s friend Sandy Grant drove M.N. and R.N. to the hospital. M.N. told Grant that she had been "touched." R.N. told the police what M.N. had reported to her. But R.N. told the police that M.N. "has accused others of also touching her which turn out to be unfounded." The examination of M.N. did not reveal evidence of physical trauma.

On November 16, M.N. met with a Child Interview Specialist with the Snohomish County Sherriff's Office, Amanda Harpell-Franz. Harpell-Franz asked M.N. why she came to see her. M.N. responded, "My sister's dad. . . . Charles." M.N. told Harpell-

2

Franz that she did not want to talk about what happened because "I think it's inappropriate." M.N. said it was "[s]omething that happened . . . [m]ore than one time" in her bedroom and "in the living room also." M.N. told Harpell-Franz that her mom was "[c]hecking the mail" when it happened and that she could "tell [Harpell-Franz] the last word of what it was. . . . Assault." When Harpell-Franz asked her what "assault" meant, M.N. said it was what she "got told some of it was." M.N. said she was nine-years-old the last time "something inappropriate happened."

A Washington State Department of Social and Health Services Child Protective Services (CPS) worker met with R.N. and Lee. R.N. agreed not to leave M.N. alone with Lee.

On July 2, 2011, R.N., A.L., and 10-year-old M.N. were sleeping together in R.N.'s bedroom. M.N. was sleeping on the floor next to the bed. Around 8:00 or 9:00 a.m., Lee let himself into the apartment, went into the bedroom, and laid down on the bed near M.N. M.N. said Lee put his hands inside her sweat pants and began touching the inside of her vagina. M.N. testified she "didn't know what to do" so she rolled over onto her side facing away from Lee. R.N. woke up briefly. After R.N. went back to sleep, Lee told M.N. to change into a dress and go to the living room. M.N. put on a dress with flowers and went to the living room. Lee made M.N. lean over the couch with her stomach against the cushions. Lee stood behind M.N., pushed her dress up, and put his penis in her vagina. When R.N. walked into the living room, Lee stopped. R.N. called the police, and then took M.N. to the hospital. CPS placed M.N. and A.L. in foster care.

The State charged Lee with rape of a child in the first degree on July 2, 2011, Count I; rape of a child in the first degree "on or about the 9th day of November, 2010," Count II; and two counts of child molestation in the first degree that occurred between June 2010 and November 8, 2010, and between June 18, 2011 and July 1, 2011, Count III and Count IV. Lee entered a plea of not guilty.

Before trial, the court held a hearing to determine whether M.N. was competent to testify and whether the statements M.N. made to R.N., Grant, and Harpell-Franz were admissible. M.N., R.N., Grant, and Harpell-Franz testified at the hearing.

During the child competency hearing, M.N. answered general questions and questions about telling the truth and telling a lie. M.N. admitted that in 2008, she falsely accused a family friend of "sexual assault" and she "lied in the past." M.N. testified she used to hear voices "telling me to kill myself" but after taking medication, she had not heard the voices for several months.

M.N. testified she was telling the truth about what Lee did. M.N. said she sometimes had trouble remembering things but that she remembered Lee sexually assaulting her and remembered some of the details, stating, "I remember how some of it happened, but I don't remember how all of it happened."[1]

The court concluded M.N. was "clearly" competent to testify under the Allen[2] factors. The court then held a hearing on whether the out-of-court statements M.N. made were admissible.

---

[1] A Department of Social and Health Services Children's Administration social worker testified that M.N. "has an Axis One diagnosis of [post-traumatic stress disorder], chronic," and was on a wait list for a residential treatment placement.

[2] State v. Allen, 70 Wn.2d 690, 424 P.2d 1021 (1967).

Harpell-Franz testified that she asked non-leading questions and followed all protocols during her interview with M.N. on November 16, 2010. The State introduced into evidence and played portions of the video of the interview. Harpell-Franz testified that she previously interviewed M.N. in 2008. Harpell-Franz said that during both interviews, she talked about telling the truth, and M.N. promised to tell the truth.

Grant testified that she met M.N. and R.N. in 2009. Grant said she became friends with the family and was "becoming like a second parent to [M.N]." Grant testified that M.N. "seemed like a truthful child" and M.N. was "very truthful in some cases." Grant said that in late 2010, R.N. said M.N. had made an allegation of sexual abuse. Grant testified M.N. "said that she was sexually molested by Mr. Charles." Grant said at the time, she "didn't know who Mr. Charles was."

Grant said that a week or two after the visit to the hospital in November 2010, she was talking to M.N. "about school and stuff." Grant said that during the conversation, M.N. told her that "sometimes Mr. Charles would touch her inappropriately." The prosecutor asked Grant if M.N. brought up the allegations against Lee "spontaneously." Grant said, "No. Like I said, we were having a conversation and we were talking about school."

R.N. testified that M.N. was sometimes truthful and sometimes not truthful. "[I]f she likes you, she will be completely honest. If she doesn't like you, she may make things up and just go from there." R.N. said, "There were days" when M.N. and Lee "were like best friends," and then "there were days like they hated each other." R.N. testified Lee "was always telling me how to parent [M.N.], how I should discipline her and this and that," and M.N. "would get really angry and upset." R.N. said there were

5

also "some jealousy issues regarding the way [Lee] treated [A.L.] and the way he treated [M.N.]."

R.N. said she was "shocked" by what M.N. told her in November 2010 and she had no prior suspicion that Lee had sexual contact with M.N. R.N. said M.N. had made prior allegations of sexual assault against her biological father, her brother A.N., a neighbor, a family friend, and R.N.'s ex-boyfriend. R.N. testified M.N. made the prior allegations "over four years ago," before A.L. was born in 2008. R.N. said M.N. later told her the neighbor and the family friend did not abuse her. R.N. testified that M.N. never told her the same thing about Lee. R.N. said she told CPS in November 2010 that she did not believe M.N., but that was before she saw Lee sexually assaulting M.N. on July 2, 2011.

The parties stipulated to the admission of a Mill Creek Police Department officer's report and agreed the court could consider it as evidence. In the November 11, 2010 report, Officer Tara Hoflack states R.N. told her M.N. had been "acting up lately and things have been disappearing around the apartment." R.N. told Officer Hoflack that M.N. "was acting a little strange as if she may be hiding something," and "[d]ue to her behavior, [R.N.] asked [M.N.] if Lee had done something to her." In response, M.N. told R.N. that "Lee had sexually assaulted her the night before."

Lee's attorney submitted copies of a 2011 interview with a child interview specialist concerning M.N.'s accusations against Lee, the 2010 interview with Harpell-Franz concerning her accusations against Lee, the 2008 interview with Harpell-Franz, and a 2007 interview between M.N. and another child interview specialist. Lee's attorney also submitted a transcript of the 2013 defense interview with M.N., medical

6

records, a copy of the witness statement R.N. gave police in November 2010, and a transcript of the defense interview with Grant.

After evaluating the evidence under RCW 9A.44.120 and the nine Ryan[3] factors, the court concluded the statements M.N. made to R.N., Grant, and Harpell-Franz in November 2010 were admissible.

During the six-day jury trial, a number of witnesses testified, including M.N., R.N., Grant, Harpell-Franz, and the nurse who examined M.N. at the hospital in 2010 and 2011. The court admitted into evidence the video of the November 16, 2010 interview with Harpell-Franz.

M.N. testified that when she first met Lee, she thought he was "a pretty okay guy." M.N. told the jury the first time Lee raped her was when she was nine-and-a-half-years-old. M.N. testified that it made her body feel "[g]ross." M.N. said Lee raped her "almost every day except for Sunday." When the prosecutor asked M.N. what she meant by "rape," M.N. replied, "Penis in the vagina." M.N. testified that Lee also put his penis in her mouth and "anus." M.N. said it usually happened in the living room but "[i]t sometimes happened in other rooms in the house, like, my room and the kitchen and the bathroom." M.N. said sometimes it happened when R.N. was "checking the mail." M.N. said that when Lee was abusing her, she was "[s]cared" and in pain.

M.N. testified that the last time Lee raped her was July 2011. M.N. said that when R.N. walked into the living room and saw Lee hurting her, R.N. told Lee to "get out," and that Lee said he was "just showing her how it would be if [he] actually was raping her."

---

[3] State v. Ryan, 103 Wn.2d 165, 691 P.2d 197 (1984).

M.N. admitted that she used to "lie a lot." M.N. testified that she lied about the family friend sexually assaulting her in 2008 because she "wanted him to stay in jail because of what he did to my friend." M.N. said she did not remember telling anyone that her father or the neighbor sexually abused her. M.N. testified that her brother, A.N., sexually abused her when she was six-years-old. M.N. said that her mother's ex-boyfriend also sexually abused her. M.N. admitted that she cut herself "[o]n the outside" of her vagina because she was scared of "[b]eing hurt again." M.N. said that she stopped cutting herself before she met Lee.

R.N. testified that Lee and M.N. did not get along. R.N. testified that M.N. "made it known that she didn't like [Lee], and she would pretty much do whatever she could to undermine anything or anything he said or how anyone else felt pretty much." R.N. could recall only one time when Lee spent the night at her apartment after A.L. was born. R.N. testified that after M.N. accused Lee of abusing her in 2010, she never left M.N. and A.L. alone at the apartment with Lee.

R.N. testified about what she saw when she walked into her living room on July 2, 2011. R.N. testified that M.N. was "on her hands and knees bent over the green couch. [Lee is] behind her, his hand down his pants playing with himself." M.N.'s "head was in the couch" and she looked like "she was crying or getting ready to cry." R.N. said she went back to her bedroom and Lee followed her, telling her that "it's not what it looks like and this and that." R.N. testified that when she asked Lee what he was doing, Lee said, "Well, she needs to know — she asked me how they do it." R.N. testified that she was "shocked, numb," and that she did not call the police right away because she

"wanted to have my composure together before I could do it because it wasn't going to be easy because he's the father of [A.L.]"

On cross-examination, R.N. testified that M.N. "has a history of dishonesty and theft" and that she likes attention. R.N. also acknowledged that M.N. had made previous accusations of sexual abuse that she later admitted were not true. R.N. testified that in 2005 when M.N. was five-years-old, M.N. said her father sexually abused her. R.N. testified that in 2008, seven-year-old M.N. was present when R.N. was sexually assaulted by an acquaintance in her apartment. R.N. said she took M.N. with her to the hospital for a sexual assault examination.

Nurse Practitioner Paula Newman-Skomski examined M.N. on November 11, 2010 and on July 2, 2011. Newman-Skomski testified that she did not observe any indications of physical trauma to M.N.'s vaginal area in 2010, but said that she was unable to fully examine M.N. because she "retracted up the table." Without objection, Newman-Skomski testified that in 2010, M.N. told her, "My sister's dad had sex with me." When Newman-Skomski asked what M.N. meant by that, M.N. said, "[O]ral and anal."

Newman-Skomski testified that during the July 2, 2011 examination, M.N. told her that Lee "put his private parts in my privates. . . . Both front and back." M.N. said, "When I tried to tell him it hurt, he said it wouldn't in a couple minutes. He does it every Saturday." M.N. told Newman-Skomski the last time it had happened was that morning when she was laying on the floor in her mom's room and Lee "reached down and tried to get in my pants. I turned away. Then we went out to the living room."

Newman-Skomski testified that M.N.'s injuries in 2011 were consistent with sexual trauma. Newman-Skomski said that M.N. had two "genital injuries with abrasion of the labia minora at 10:00, fossa laceration at 6:00," and a "possible hymenal injury at 3:00." Newman-Skomski testified that M.N. indicated the abrasions were painful when touched with a Q-tip cotton swab. Newman-Skomski testified M.N.'s rectum had an "increased area of redness" and tenderness, and M.N. reported having diarrhea and rectal bleeding, both of which were consistent with anal penetration. Newman-Skomski said that M.N. told her she had not taken a shower after the assault and that she was still wearing the same underwear she had on at the time of the assault. Newman-Skomski took swabs from M.N. and collected M.N.'s underwear.

The defense called several witnesses, including the nurse who examined M.N. in 2007 for sexual assault and a shelter case manager who testified Lee was a resident at the shelter from 2010 to the summer of 2011. The principal of the elementary school M.N. attended in fourth grade and a social worker at the same elementary school testified that M.N. "had a reputation for not being honest." Washington State Patrol Crime Laboratory analyst Mariah Low testified that she tested the swabs and underwear collected from M.N. in 2011 and did not find any male DNA[4] or detect any semen or saliva on the samples tested.

The jury found Lee not guilty of the charges of rape of a child in the first degree, alleged to have occurred "on or about" November 9, 2010, Count II; and not guilty of both counts of child molestation in the first degree alleged to have occurred in 2010 and 2011, Count III and Count IV. The jury found Lee guilty of the charge of rape of a child in the first degree on July 2, 2011, Count I.

---

[4] Deoxyribonucleic acid.

The court imposed an indeterminate sentence of 114 months to life and imposed a number of community custody conditions.

Lee appeals.

## ANALYSIS

Child Hearsay

Lee contends the court erred in ruling M.N.'s hearsay statements to R.N., Grant, and Harpell-Franz in November 2010 were admissible under RCW 9A.44.120 and State v. Ryan, 103 Wn.2d 165, 691 P.2d 197 (1984).

We review a court's admission of child hearsay statements under RCW 9A.44.120 for abuse of discretion. State v. Beadle, 173 Wn.2d 97, 111-12, 265 P.3d 863 (2011). Because only the trial court has the opportunity to see and evaluate the child and the other witnesses, it is in the best position to determine the reliability of child hearsay statements. State v. Pham, 75 Wn. App. 626, 631, 879 P.2d 321 (1994). Accordingly, "[t]he trial court is necessarily vested with considerable discretion in evaluating the indicia of reliability." State v. C.J., 148 Wn.2d 672, 686, 63 P.3d 765 (2003). The court abuses its discretion when it bases its decision on unreasonable or untenable grounds. C.J., 148 Wn.2d at 686. We review the factual findings supporting the admission for substantial evidence. State v. Halstien, 122 Wn.2d 109, 128, 857 P.2d 270 (1993). Substantial evidence is evidence sufficient to persuade a fair-minded rational person of the truth of the premise asserted. Halstien, 122 Wn.2d at 129.

Under RCW 9A.44.120(1), a statement by a child under the age of 10-years-old describing sexual contact is admissible if the "time, content, and circumstances of the statement provide sufficient indicia of reliability." In Ryan, the court identified nine

11

factors to determine reliability: (1) whether there is an apparent motive to lie, (2) the declarant's general character, (3) whether more than one person heard the statements, (4) whether the statements were spontaneous, (5) the timing of the declaration and the relationship between the declarant and the witness, (6) whether the statement contains express assertions about past facts, (7) whether cross-examination could show the declarant's lack of knowledge, (8) whether the possibility that the declarant's recollection is faulty is remote, and (9) whether the circumstances surrounding the statement are such that there is no reason to suppose the declarant misrepresented the defendant's involvement. Ryan, 103 Wn.2d at 175-76; see also State v. Swan, 114 Wn.2d 613, 647-48, 790 P.2d 610 (1990).

We consider the Ryan factors as a whole; no single factor is decisive. State v. Young, 62 Wn. App. 895, 902, 802 P.2d 829, 817 P.2d 412 (1991). The statements need to only substantially meet these factors. State v. Woods, 154 Wn.2d 613, 623-24, 114 P.3d 1174 (2005).

Here, the trial court engaged in an extensive analysis of each of the Ryan factors in determining the hearsay statements M.N. made in November 2010 were admissible. The court found factor one, an apparent motive to lie; factor two, general character; and factor nine, no reason to suppose misrepresentation, did not support finding M.N.'s statements were reliable.

> The first of the so-called Ryan factors is whether the child has a motive to lie. And as I think was noted, this factor is at least somewhat related to also the last factor, whether the circumstances surrounding the statement are such that there is no reason to suppose the declarant misrepresented the defendant's involvement. They are slightly different, but also related.
>     Both of these factors the Court sees as generally favoring the defense's position. . . .

. . . [I]t does appear that the child did have issues with the defendant which arguably are separate from any allegations of child abuse. And I think the record has been developed in that regard. And I think the mother herself talked of kind of a love-hate relationship. There were apparent reasons, regardless of their merit, for why the child disliked Mr. Lee and arguably had then a motive to lie against him.

And also in specifically the context of these statements themselves, as ultimately was reflected in evidence admitted at the close of this hearing by stipulation as to what one of the officers reported, the mother apparently told the officer that [M.N.] had been acting up lately, and things had been disappearing from around the house. And she then asked if the defendant had done something. That I think was the gist of what the officer had reported.

The fact that [M.N.] had been acting up and things were missing suggest that [M.N.] may have had a motive to divert attention from those issues and raise allegations of a different and very serious nature regarding Mr. Lee.

Without, again, elaborating in great detail on this point, the Court does see that as to factors one and nine regarding the child's motives, on balance those factors do tend to support the defense position.

As does factor number two. Again, without describing this point in great detail, suffice it to say, the child has issues about truthfulness and otherwise, and this is a factor which supports the defense position as well.

As the court correctly noted, the sixth factor, whether the statement contains an expressed assertion of past fact, is now "usually viewed as a non-factor" under the case law because "statements virtually always include assertions of fact." See Swan, 114 Wn.2d at 650-51 (child hearsay statements about sexual abuse typically contain statements about past fact). As to factor seven, whether the child's lack of knowledge could be established through cross-examination, the court also noted that in Woods, the Supreme Court "indicate[d] that this is largely a non-factor where the child testifies." See Woods, 154 Wn.2d at 624 (stating, "Factor seven applies in cases where the child declarant is unavailable to testify").

Lee challenges the court's determination that factor three, whether more than one person heard the statements; factor four, spontaneity; factor five, timing; and factor

eight, the possibility of faulty recollection, supported finding the statements were reliable and admissible at trial. The court found factor three, whether more than one person heard the child's statements, significant.

> I think it is particularly significant here in that independently with the interviews of Amanda Harpell[-Franz] and Sandy Grant that the child used the term inappropriate. These interviews occurred days apart. The fact that both witnesses heard the child use that same term is at least of some significance.
>
> Now, [defense counsel] raised as a threshold issue the vagueness of these statements in an argument that they should not be considered at all. Ultimately the Court might agree in some other context. But given the context here where allegedly the child had already made a more specific disclosure to her mother, one can reasonably infer and conclude that the reference to inappropriate contact was, given the context here, describing acts of sexual contact, albeit in a rather general manner.

The record supports the finding that M.N. independently told three people, her mother, Grant, and Harpell-Franz, that Lee had sexual or "inappropriate" contact with her. Lee seems to suggest that this factor should be discounted because M.N. had previously made false allegations of abuse that she later retracted. But the record shows that M.N. made consistent statements to multiple people that Lee abused her and never retracted her allegations. "[W]hen more than one person hears a similar story of abuse from a child, the hearsay statement is more reliable." State v. Kennealy, 151 Wn. App. 861, 883, 214 P.3d 200 (2009).

The court concluded the fourth factor, whether the child's statements were made spontaneously, was "very important here," and also weighed in favor of admissibility.

> The key is to whether the response of the child is elicited by means of leading or suggestive questions and answers.
>
> The key here with all these statements is the first person allegedly to hear the disclosure, the mother. And as reflected by the stipulated statement through the officer, the mother apparently did pose a question to the child as to whether the defendant had done something. But this was posed in a very general and open-ended way. The mother herself

14

could not provide today on the witness stand much about the circumstances of the disclosure, and that is of concern to the Court.

But the overall picture that is painted here is one where the mother would not have been seeking to pose leading or suggestive questions to the child. As she did testify, the mother had no prior suspicions of the defendant doing any such alleged sexual abuse. She testified that she was surprised by her daughter's disclosure. Indeed, she went on to testify that at that time or around this time, thinking back to November 2010, she, in fact, did not believe her child's statements about Mr. Lee. That may have significance for other purposes. But on this issue, it would circumstantially indicate that she was not seeking by means of leading or suggesting to the child that she make sexual abuse disclosures about Mr. Lee.

Likewise, the other statements to Sandy Grant and Amanda Harpell[-Franz] are of such a nature that this factor serves to support the State's position regarding them. Here, too, the circumstances that Ms. Grant described about the disclosure at the hospital are not crystal clear. But the evidence does indicate that this is not a situation where Sandy Grant sought to put words in the child's mouth, but, instead, that term inappropriately was one that apparently the child offered.

As to the interview with Amanda Harpell-Franz, Exhibit 3 describes obviously the interview at length. It is fair to say that as an experienced child interviewer, Ms. Harpell-Franz did seek to ask open-ended questions. And the disclosures, to the extent that they were made, were made spontaneously as that term has been interpreted regarding this fourth Ryan factor.

The record supports the court's finding that M.N.'s statements were spontaneous. A child's statements are spontaneous "so long as the questions are not leading or suggestive." Young, 62 Wn. App. at 901. Although R.N. specifically asked M.N. if Lee did something to her, R.N. did not ask leading or suggestive questions about sexual contact. R.N. testified that she was "shocked" when M.N. told her what Lee had done and that she did not suspect Lee of abusing M.N. R.N. also testified that unlike previously, M.N. never told R.N that Lee did not sexually abuse her.

The record shows that Harpell-Franz asked open-ended questions, and Grant did not know who Lee was at the time M.N. told her about the abuse in the context of a discussion about school. Although Grant testified that M.N. did not make the allegations

15

against Lee "spontaneously," it is clear from the context of her testimony that Grant simply meant M.N. made the allegation during their conversation about school, not that her questions were leading or suggestive.

The court found that factor five, the timing of the declaration and the relationship between the declarant and the witnesses; and factor eight, the possibility of the declarant's faulty recollection being remote, weighed in favor of admissibility.

> In terms of the timing of the declaration and whether the possibility of the declarant's faulty recollection being remote, I think it has essentially been conceded by the defense that the alleged sexual abuse recited in these statements did come close in time to these interviews. So that is a factor which generally favors the State.
> As to the relationship between the declarant and these witnesses, that's a complicated question. And there are indeed aspects which will favor the defense here. But certainly as to Amanda Harpell-Franz, the Court sees her as a neutral figure. I understand [defense counsel]'s arguments in this respect, but I think the witness's testimony made clear that her role was viewed by her, Ms. Harpell-Franz, as being a reporter of what the child has to say and to try to reflect that in as unbiased and open-ended fashion as she could.
> Again, the relationships of the other witnesses — Ms. Grant and the mother — obviously they are much closer to this child. And that gives rise to concerns which would tend to favor the defense. But as already noted, particularly regarding the mother, these two witnesses were ones who were not predisposed to want to believe or accept such allegations.
> And so, on balance, the Court views five and eight as generally tending to favor the State.

The court's conclusion that factor five and factor eight weighed in favor of admissibility is supported by the record. Substantial evidence supports the finding that the statements M.N. made were close in time to the alleged sexual abuse, and the possibility of M.N. having a faulty recollection was remote. The record also supports the finding that the relationship between M.N. and the witnesses weighed in favor of admissibility. When the witness is in a position of trust with the child, this factor is likely to enhance the reliability of the child's statement. Swan, 114 Wn.2d at 650; but see

16

Ryan, 103 Wn.2d at 176 (concluding children's statements to their mothers lacked trustworthiness in part because the mothers were told prior to questioning the children of the probability the defendant had abused their children and were thus predisposed to believing they had been abused).

M.N. had a close relationship with her mother and Grant, and the record shows that neither R.N. nor Grant was predisposed to believing M.N. had been sexually abused. Harpell-Franz was a professional trained in interviewing sexually abused children.

After carefully weighing the evidence and balancing the Ryan factors, the court determined that there were sufficient indicia of reliability to admit M.N.'s hearsay statements.

> As recited, there are certainly significant factors in favor of the defense. There are also significant factors in favor of the State. On balance, particularly given that key factor, number four, regarding spontaneity, as that term has been applied, the Court respectfully concludes that there is sufficient indicia of reliability to allow admissibility of the three sets of statements which I have identified under the child hearsay statute [RCW] 9A.44.120.

In addition, the court noted the statements themselves were "not very detailed or specific" and "may be less important than in many cases of this type." The court also noted that unlike "where the child hearsay portion of the case is clearly huge and sometimes almost determinative," M.N. would be subject to cross-examination at trial "at great length and I expect with a fair amount of leeway with the Court."

Substantial evidence supports the finding that factors three, four, five, and eight supported admission of the November 2010 hearsay statements M.N. made to R.N., Grant, and Harpell-Franz.

Lee argues that even if four of the factors favor admissibility, the court erred in concluding that the Ryan factors were "substantiality met." Lee contends that "at best," a "mere plurality" of factors supported reliability. But, as we noted earlier, "not every factor listed in Ryan needs to be satisfied before a court will find a child's hearsay statements reliable under the child victim hearsay statute." Swan, 114 Wn.2d at 652; see Young, 62 Wn. App. at 902; Woods, 154 Wn.2d at 623-24; see also In re Dependency of A.E.P., 135 Wn.2d 208, 230-31, 956 P.2d 297 (1998); Ryan, 103 Wn.2d at 176-77. We conclude the court did not abuse its discretion by admitting M.N.'s statements.

Exclusion of Evidence of Policy at M.N.'s School

Lee asserts the court abused its discretion by excluding evidence that the elementary school principal would not allow staff to be alone with M.N.

We review the decision to exclude evidence for abuse of discretion. State v. Posey, 161 Wn.2d 638, 648, 167 P.3d 560 (2007). A trial court abuses its discretion when it bases its decision on untenable grounds or reasons. State v. Nguyen, 131 Wn. App. 815, 819, 129 P.3d 821 (2006). An abuse of discretion occurs only when no reasonable person would take the view adopted by the trial court. State v. Atsbeha, 142 Wn.2d 904, 913-14, 16 P.3d 626 (2001). A trial judge, not an appellate court, is in the best position to evaluate the prejudicial effect and relevancy of evidence. Posey, 161 Wn.2d at 648.

18

The defense called the principal of the elementary school M.N. attended in fourth grade to testify about M.N.'s reputation for truthfulness. The principal testified that she met with M.N. regarding "two distinct allegations" of "sexual abuse or abuse," and that "[t]here were inconsistencies" in M.N.'s statements. The principal also testified M.N. "had not been honest with [her]" on several occasions, and M.N. had "a reputation for not being honest."

Defense counsel then asked the principal whether she "instituted a policy in her building where staff were not allowed to be alone with [M.N.]" The prosecutor objected as an improper comment on M.N.'s "disposition for truthfulness or untruthfulness." The court sustained the objection, ruling that it was "a comment upon an individual's veracity" and, in any event, defense counsel had already "elicited from this witness . . . questions and answers about [M.N.'s] reputation for truthfulness."

"A witness's expression of personal belief about the veracity of another witness is inappropriate opinion testimony in criminal trials." State v. Perez-Valdez, 172 Wn.2d 808, 817, 265 P.3d 853 (2011). "Opinion testimony" is testimony " 'based on one's belief or idea rather than on direct knowledge of the facts at issue.' " State v. Demery, 144 Wn.2d 753, 760, 30 P.3d 1278 (2001) (quoting BLACK'S LAW DICTIONARY 1486 (7th ed. 1999)). Comments on the credibility of a key witness are improper because issues of credibility are reserved for the trier of fact. Demery, 144 Wn.2d at 759.

The court did not abuse its discretion in excluding the testimony regarding the school policy. The testimony amounted to improper opinion testimony on veracity.

Reasonable Doubt Jury Instruction

Lee challenges the jury instruction defining "reasonable doubt," 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.01, at 85 (3d ed. 2008). Lee claims the court erred by instructing the jury that "[i]f, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt." Lee relies on State v. Emery, 174 Wn.2d 741, 278 P.3d 653 (2012), to argue the "belief in the truth" language improperly misstates the jury's role and "encourages the jury to undertake an impermissible search for the truth." We disagree.

The Washington Supreme Court has expressly approved of this instruction as a correct statement of the law. In State v. Fedorov, 181 Wn. App. 187, 199-200, 324 P.3d 784 (2014), we recently considered and rejected the same argument. See State v. Bennett, 161 Wn.2d 303, 317-18, 165 P.3d 1241 (2007); State v. Pirtle, 127 Wn.2d 628, 656-58, 904 P.2d 245 (1995). In Fedorov, we held that the "abiding belief" language in the instruction was not the equivalent of the improper "speak the truth" remarks made by the State during closing in Emery. Fedorov, 181 Wn. App. at 200; Emery, 174 Wn.2d at 751; see also Bennett, 161 Wn.2d at 317-18; Pirtle, 127 Wn.2d at 656-58. We adhere to our decision in Fedorov.

Prosecutorial Misconduct

Lee contends prosecutorial misconduct during closing argument requires reversal. Lee asserts the prosecutor improperly stated a personal opinion and vouched for M.N.'s credibility. Lee also contends the prosecutor improperly shifted the burden of proof and commented on his right to not testify.

To prevail on a claim of prosecutorial misconduct, a defendant must show the conduct was both improper and prejudicial. State v. Lindsay, 180 Wn.2d 423, 440, 326 P.3d 125 (2014). The court considers a claim of prosecutorial misconduct in the context of the entire argument, the issues in the case, the evidence, and the instructions given to the jury. Emery, 174 Wn.2d at 764 n.14. The prosecutor's improper comments are prejudicial " 'only where there is a substantial likelihood the misconduct affected the jury's verdict.' " State v. Yates, 161 Wn.2d 714, 774, 168 P.3d 359 (2007)[5] (quoting State v. McKenzie, 157 Wn.2d 44, 52, 134 P.3d 221 (2006)).

During closing argument, a prosecutor has wide latitude to draw reasonable inferences from the evidence and may freely comment on the credibility of the witnesses based on the evidence. State v. Stenson, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997).

As long as the prosecutor does not directly refer to the defendant's decision not to testify, the prosecuting attorney may comment on the lack of defense evidence. State v. Borboa, 157 Wn.2d 108, 123, 135 P.3d 469 (2006).

It is improper for a prosecutor to personally vouch for the credibility of a witness. Lindsay, 180 Wn.2d at 437. "Improper vouching occurs when the prosecutor expresses a personal belief in the veracity of a witness or indicates that evidence not presented at trial supports the testimony of a witness." State v. Thorgerson, 172 Wn.2d 438, 443, 258 P.3d 43 (2011). But the prosecutor is allowed to argue that the evidence does not support a defense theory and is entitled to make a "fair response to the arguments of defense counsel." State v. Russell, 125 Wn.2d 24, 87, 882 P.2d 747 (1994).

---

[5] Emphasis in original.

Lee contends the prosecutor improperly vouched for M.N.'s credibility during rebuttal by arguing that the State did not get to choose the victim from "central casting."

During closing argument, defense counsel focused almost exclusively on M.N.'s credibility. For example, the defense argued:

> This is a sad story about a little girl with a lot of issues and need for attention and need for affection. A lot of issues. And about the web that she spun, she got caught up in it. Mr. Lee sure got caught up in it. But it's a web of falsehoods.

The defense also argued M.N. had a history of "acting out" and making sexual allegations before her allegations against Lee.

> [M.N.] told us about her behavior, and she told us about her behavior before [Lee] ever came into her life. So as much as [the prosecutor] would like you to believe that all of her acting out was a result of some abuse by Mr. Lee, it predated him. Her [oppositional defiant disorder] diagnosis was when she was four years old. Her self-harm was before [Lee]. Her vaginal self-harm was before [Lee]. Her history of sexual allegations was before [Lee].

During rebuttal, the prosecutor responded to the argument and acknowledged the child's past trauma.

> I don't pick the folks who come here and talk about the things that have been done to them. I don't go to central casting and try to find cute seven-year-old kids who have no trauma — who have no previous trauma in their lives. I don't go to central casting.

The court overruled the defense objection.

> [DEFENSE]: Objection, Your Honor. The first person is improper. Personal opinion is not allowed in argument.
> THE COURT: No personal attributions by either counsel are appropriate. Given the context, . . . I will have you continue with your argument.

The prosecutor's statement in rebuttal was not improper. The prosecutor is entitled to respond to the arguments of defense counsel. Russell, 125 Wn.2d at 87.

Defense counsel raised the issue of M.N.'s credibility and argued she should not be believed because of her previous history of acting out and making false allegations. The "central casting" statement was a fair response to the defense argument and an attempt to point out that M.N. had previous trauma in her life but that history was not a reason to disbelieve her. The argument does not vouch for M.N.'s veracity or imply that the prosecutor believed M.N.'s allegations against Lee.

United States v. Smith, 962 F.2d 923 (9th Cir. 1992), and State v. Stith, 71 Wn. App. 14, 856 P.2d 415 (1993), are distinguishable.

In Smith, the prosecutor assured the jury that the State's key witness could not say "whatever he wanted to say" as defense counsel suggested because he would prosecute the witness for perjury if he did so. Smith, 962 F.2d at 928.[6] The court held that this remark "constituted the sort of personal and institutional guarantee that the law forbids" because it suggested the prosecutor believed the witness's testimony was true. Smith, 962 F.2d at 933. The prosecutor further "reinforced this message with repeated comments aimed at establishing his own veracity and credibility as a representative of the government," such as stating that his job was "not to seek a conviction but rather to guarantee a fair trial and turn over any favorable evidence to the defense," and that "if I did anything wrong in this trial I wouldn't be here. The court wouldn't allow that to happen." Smith, 962 F.2d at 933-34.[7] The court reversed, concluding the prosecutor's comments as a whole were not invited and "placed the prestige of the law enforcement branch of government behind his conduct of the trial and behind [the witness]'s testimony." Smith, 962 F.2d at 936.

---

[6] Internal quotation marks omitted.

[7] Internal quotation marks omitted, alteration omitted.

In Stith, the prosecutor alluded to the defendant's prior drug offense in closing and stated that the defendant was "just coming back and he was dealing again." Stith, 71 Wn. App. at 16.[8] In rebuttal, the prosecutor then told the jury:

> Our system has incredible safeguards that would not allow a case like this to come to court if somehow the police acted improperly. So the question of probable cause is something the judge has already determined before the case came before you today.

Stith, 71 Wn. App. at 17.[9]

This court reversed, concluding the statements were "flagrantly improper" and "[t]aken together . . . not only implied that the trial was a useless formality because the real issues had already been determined but also directly stated that [the defendant] was out on the streets, dealing again." Stith, 71 Wn. App. at 22-23.

Lee also contends the prosecutor improperly shifted the burden of proof and commented on his right to not testify during rebuttal.

The State must prove the elements of the charged crime beyond a reasonable doubt. In re Winship, 397 U.S. 358, 361, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). It is improper for the prosecutor to argue that the defendant carries the burden of proof. Thorgerson, 172 Wn.2d at 453. A defendant has no duty to present evidence, and it is error for the State to suggest otherwise. State v. Cheatam, 150 Wn.2d 626, 652, 81 P.3d 830 (2003). It is also improper for a prosecutor to comment on the defendant's failure to testify. A comment on a defendant's right to remain silent occurs when the State uses the defendant's exercise of his Fifth Amendment rights as either substantive evidence of guilt or to suggest that his silence is an admission of guilt. State v. Lewis, 130 Wn.2d 700, 704-05, 707, 927 P.2d 235 (1996).

---

[8] Internal quotation marks omitted.

[9] Internal quotation marks omitted.

Here, in response to the defense closing argument, the prosecutor addressed each of the reasons the defense attorney cited as to why M.N.'s testimony was not credible. The prosecutor then argued, "What was not discussed in closing argument, what we didn't hear about was what the defendant did. We didn't hear an explanation about what the defendant —." Defense counsel objected. The court sustained the objection and instructed the jury to "disregard" the argument. Because the trial court instructed the jury to disregard the comment, Lee cannot establish prejudice. We presume the jury follows the instructions of the court. State v. Kirkman, 159 Wn.2d 918, 928, 155 P.3d 125 (2007).

Proof of Rape of a Child in the First Degree

Lee contends that because the State failed to prove he was not married to M.N., insufficient evidence supports the conviction for rape of a child in the first degree under RCW 9A.44.073.

We review a claim of sufficiency of the evidence to determine " 'whether any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt.' " State v. Drum, 168 Wn.2d 23, 34-35, 225 P.3d 237 (2010) (quoting State v. Wentz, 149 Wn.2d 342, 347, 68 P.3d 282 (2003)). A challenge to the sufficiency of the evidence necessarily admits the truth of the State's evidence and all reasonable inferences that can be drawn from that evidence. Drum, 168 Wn.2d at 35. Circumstantial and direct evidence are equally reliable in determining sufficiency of the evidence. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

To establish Lee was guilty of rape of a child in the first degree, the State had the burden of proving beyond a reasonable doubt that Lee had "sexual intercourse with

25

another who is less than twelve years old and not married to the perpetrator and the perpetrator is at least twenty-four months older than the victim." RCW 9A.44.073(1).

First, as a matter of law, Lee could not have been married to M.N. The evidence established M.N. was less than 11-years-old at the time of the charged crime. Every marriage in Washington where either person is under 17-years-old is void. RCW 26.04.010(2). Viewed in the light most favorable to the State, the evidence also established R.N. was M.N.'s mother, Lee and R.N. were in a relationship, and Lee and R.N. had a child together. A rational trier of fact could conclude that Lee was not married to M.N. at the time of the charged crimes.

## Cumulative Error

Lee contends cumulative error denied him a fair trial. Under the cumulative error doctrine, trial errors that do not warrant a new trial by themselves may warrant a new trial when considered cumulatively. State v. Greiff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). Because there were no errors, the cumulative error doctrine does not apply.

## Community Custody Conditions

Lee challenges two of the community custody conditions imposed by the court. We review whether a court had the statutory authority to impose a community custody condition de novo. State v. Armendariz, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). A court may impose only a sentence authorized by statute. State v. Barnett, 139 Wn.2d 462, 464, 987 P.2d 626 (1999). A " '[c]rime-related prohibition' . . . directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10); State v. Land, 172 Wn. App. 593, 605, 295 P.3d 782 (2013).

26

Lee contends the community custody condition prohibiting Internet access and allowing a search of any computer he uses is not crime related and must be stricken.[10] The State concedes that because there is no evidence the charged crime involved the use of a computer or the Internet, this condition is not crime related. We accept the State's concession as well taken. See State v. O'Cain, 144 Wn. App. 772, 775, 184 P.3d 1262 (2008) (condition prohibiting Internet access is not crime related where the record shows Internet usage was not related to the crime).

Lee relies on Land to argue the condition that requires him to submit to plethysmograph testing is not authorized by statute and is unconstitutional.

In Land, this court held that a condition requiring an individual to submit to plethysmograph testing subject only to the discretion of a community corrections officer violates a defendant's constitutional right to be free from bodily intrusions. Land, 172 Wn. App. at 605. We concluded that while plethysmograph testing "can properly be ordered incident to crime-related treatment by a qualified provider," the testing "may not be viewed as a routine monitoring tool subject only to the discretion of a community corrections officer." Land, 172 Wn. App. at 605.

In State v. Riles, 135 Wn.2d 326, 343-45, 957 P.2d 655 (1998), abrogated on other grounds by State v. Valencia, 169 Wn.2d 782, 239 P.3d 1059 (2010), the Washington Supreme Court upheld conditions requiring plethysmograph testing as part of the defendant's sexual deviancy treatment.[11] The court concluded that

---

[10] Condition 11 states, "Do not access the Internet on any computer in any location, unless such access is approved in advance by the supervising Community Corrections Officer and your treatment provider. Any computer to which you have access is subject to search."

[11] The text of the community custody condition approved of in Riles states, "Submit to polygraph and plethysmograph testing upon the request of your therapist and/or Community Corrections Officer, at your own expense." Riles, 135 Wn.2d 337 (italics omitted).

plethysmograph testing is "a treatment device that can be imposed as part of crime-related treatment or counseling." Riles, 135 Wn.2d at 345. However, "[i]t is not permissible for a court to order plethysmograph testing without also imposing crime-related treatment" because "[p]lethysmograph testing serves no purpose in monitoring compliance with ordinary community placement conditions." Riles, 135 Wn.2d at 345.

Here, in accord with Riles, the court ordered Lee to participate in plethysmograph testing as part of his sexual deviancy treatment and subject to the approval of Lee's "sexual deviancy therapist." Conditions 12 and 14 state:

> 12.     Participate and make progress in sexual deviancy treatment. Follow all conditions outlined in your treatment contract. Do not change therapists without advanced permission of the sentencing Court.
>
> . . . .
>
> 14.     Participate in plethysmograph and polygraph examinations as directed by the supervising Community Corrections Officer, to ensure conditions of community custody. Plethysmographs should only be administered with approval of Defendant[']s sexual deviancy therapist.

Reading the conditions together, it is clear that the community corrections officer's authority to direct plethysmograph testing is limited to sexual deviancy treatment. Unlike in Land, the plethysmograph testing is not subject "only to the discretion of a community corrections officer." Land, 172 Wn. App. at 605.

We also reject Lee's argument that the plethysmograph condition violates his constitutional right to be free from bodily intrusion. "Although a 'defendant's constitutional rights during community placement are subject to the infringements authorized by the [Sentencing Reform Act of 1981, chapter 9.94A RCW],' " a restriction on a fundamental right is constitutional only if it is "reasonably necessary to accomplish the essential needs of the state and the public order." Riles, 135 Wn.2d at 350 (quoting

28

State v. Ross, 129 Wn.2d 279, 287, 916 P.2d 405 (1996)). The plethysmograph testing condition is reasonably necessary to achieve a compelling state interest, namely, protecting the public. Because the condition can only be administered for treatment purposes and only with the "approval of [Lee]'s sexual deviancy therapist," it is also narrowly drawn.

We remand to strike the community custody condition restricting Lee's Internet use. In all other respects, we affirm.

WE CONCUR:

Trickey, J.

Cox, J.